**In re UNITED NESCO CONTAINER CORPORATION (related to United Nesco Management Company), Debtor.**

**Bankruptcy No. 81–05414K.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Jan. 20, 1987.

Thomas B. Kenworthy, Philadelphia, Pa., for debtor.

Leonard P. Goldberger, Philadelphia, Pa., for Cornell Leasing Corp.

Marvin Krasny, Philadelphia, Pa., for Creditors' Committee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

After a false start of our own in approaching the matter at hand, we have determined that the only issue before us is the limited function of completing the analysis of our predecessor, the Honorable William A. King, Jr., in calculating the claim of CORNELL LEASING CORP. (hereinafter "Cornell") against the Debtor-lessee, pursuant to paragraph 20(c) of the parties' contract dated February 28, 1980, for the lease of certain computer equipment, begun in Judge King's Opinion in this matter published at 47 B.R. 230 (Bankr.E.D.Pa.1985). We conclude that Cornell is entitled to a claim of $35,213.07.

On December 31, 1981, the Debtor filed this bankruptcy case, which has been jointly administered with a case filed at the same time by the Debtor's management company. On July 29, 1982, the Debtor rejected the lease contract in issue by agreement of the parties.

However, on June 30, 1982, prior to the lease rejection, Cornell had filed the first of its series of Proofs of Claim arising out of this transaction, in the amount of $158,-152.00, for alleged damages resulting from the breach of the contract, pursuant to 11 U.S.C. § 365(g). On November 17, 1982, the Debtor filed Objections to a number of claims against it, including that of Cornell.

On April 21, 1983, the Debtor's Objection to Cornell's claim, at that time represented by an Amended Proof of Claim filed on March 1, 1983, in the amount of $117,-735.07, came before the court, per Judge King, for a hearing. The Debtor, stating that it had made payments pursuant to the contract through the date that it rejected the contract and then relinquished the equipment, called no witnesses on its behalf and argued that, since the lease had terminated by agreement, no damages were due to Cornell. Cornell adduced testimony from its President, John B. Hentschel, and its Vice-President, Michael Harding.

The case remained under advisement by the court until March 5, 1985, when the decision referred to *supra* was rendered. In that decision, the court held that Cornell's disposition of the equipment, in a lease-purchase agreement in September, 1982, with Superior Beverage Co. (hereinafter "Superior"), was a "sale" rather than a "lease." This decision was made on the basis of analysis of § 1–201(37) of the Uniform Commercial Code (UCC), which provides that a contract designated as a "lease" is legally considered as a "sale" when the "lessee" has the option to become the owner for a nominal consideration. *See Sight & Sound of Ohio, Inc. v. Wright,* 36 B.R. 885, 890–91 (S.D.Ohio 1983); *In re Butcher Boy Meat Market, Inc.,* 29 UCC Rptg.Serv. 649, 651 (Bankr.E.D.Pa.1980); and *Bonczek v. Pascoe Equipment Co.,* 304 Pa.Super. 11, 18–21, 450 A.2d 75, 78–80 (1982). Here, Cornell's President testified that Superior could become that owner of the equipment upon the payment of $1.00 at the end of the contract, which clearly represented nominal consideration.

Judge King rejected the Debtor's argument that the mutually-agreeable rejection of the contract between Cornell and the Debtor constituted a waiver by Cornell of its claim for "remedies," as provided in the contract. However, he held that, since Cornell's disposition of the computer equipment to Superior was by sale rather than by lease, Cornell's damages must be computed pursuant to paragraph 20(c) of the

contract[1] rather than pursuant to paragraph 20(b), relating to disposition of the equipment by re-renting it. Cornell, in computation of its Proofs of Claim, had utilized paragraph 29(b). Consequently, the court provided Cornell with a thirty (30) day period "to recalculate the appropriate amount of its claim according to the direction given in the foregoing Opinion and file an amended proof of claim." Order of March 5, 1985.

On April 4, 1985, Cornell, in accordance with this Order, filed another Amended Claim, seeking an amount of $92,102.68. The matter then disappeared from sight until after Judge King had left the bench and his matters were being heard by Chief Judge Emil F. Goldhaber. On August 5, 1986, a Motion of Cornell seeking payment of its most recent Amended Proof of Claim, to which the Debtor had never responded, and sanctions for failure to pay the Claim, were argued before Judge Goldhaber, who indicated at the end of this colloquy that he or Judge King's successor would take the matter under advisement.

Nevertheless, the matter did not resurface until October 3, 1986, when Cornell's counsel contacted us and advised us that he believed that we had the matter under advisement. Unfortunately, we had no prior knowledge of this matter. However, we thereupon located the file, and proceeded to enter an Order of October 20, 1986, listing the matter for legal argument on October 30, 1986.

Unfortunately, through the date of the argument, this court labored under the mistaken impression that Judge King's previous Opinion had held that the contract between Cornell and the Debtor, rather than that between Cornell and Superior, was a "sale" rather than a "lease." In our Order of October 20, 1986, we therefore asked the parties to prepare for legal argument on the issue of whether Cornell's damages must be determined in accordance with Chapter 5 of Article 9 of the UCC. We heard argument on October 30, 1986, and requested, per an Order of October 31, 1986, that the Debtor designate any specific Objections to Cornell's most recent Proof of Claim on or before November 10, 1986, and for the parties to simultaneously prepare Briefs and any Reply Briefs on or before November 24, 1986, and December 1, 1986, respectively. Without at this point any apparent recognition by any party that we were off the track, all agreed that the issues to be briefed were whether Cornell had provided the notice of disposition of the equipment required by 9–504(3) of the UCC and what the consequences of a failure to properly provide this notice should be in the evaluation of Cornell's claim.

We received the Debtor's brief Objection to Cornell's "claim for attorneys' fees and costs and ... interest" and, thereafter, Cornell's Brief in timely fashion. In this Brief, Cornell argued that the contract was, as was expressly provided by its paragraph 21, governed by Connecticut law and that, per what it claimed were the controlling authorities interpreting 9–504(3) in that state, contended that it was entitled to the damages sought in its Proof of Claim.[2]

---

**1.** The entire text of paragraph 20 of the contract is reproduced in the previous Opinion of the court in this matter at 47 B.R. 231–32. Paragraph 20(c) is reproduced at page 973 *infra*.

**2.** While we now recognize that this analysis of ours and, consequently, of Cornell, following our lead, was incorrect, we should further note that we seriously doubt that Cornell would prevail in asserting any legally viable claim if we followed a 9–504(3) analysis under Connecticut law. Contrary to Cornell's assertions, we believe that 9–504(3), contemplates that the notice of disposition of collateral must be written. Section 9–504(3) requires that notice be "sent" and, with all due respect to those few courts which hold to the contrary, we do not logically see how oral notice can be said to be "sent."

The law of Connecticut appears consistent with our view. *See Savings Bank of New Britain v. Booze*, 34 Conn.Sup. 632, 382 A.2d 226, 228 (1977). It is clear that no written notice was provided here, and the record is devoid of proof that *any* notice of the terms of the resale was given to the Debtor, even orally. See transcript of testimony, April 21, 1983 (hereinafter "T."), at 19. (Mr. Henschel admits that he had no communications with Debtor, stating that Mr. Harding would give such testimony, which he did not do). Furthermore, we believe that, in a decision subsequent to and more factually analogous to the instant case than *Booze, Hertz Commercial Leasing Corp. v. Dynatron, Inc.*, 37 Conn.Sup. 7, 427 A.2d 872, 875 (1980), the majority and preferable rule that the failure to provide notice per 9–504(3) bars a deficiency is

The Debtor's three and one-half page Brief was not filed until December 1, 1986. However disappointed we were in its late filing and brevity, we must concede that it was enlightening. Eschewing the 9–504(3) analysis which probably would have resulted in its prevailing,[3] the Debtor accurately points out that Judge King, in his prior decision, held only that the contract of Cornell with Superior was a "sale," and that the transaction between the Debtor and Cornell was never said to be anything but a true lease. Also included is an application of paragraph 20(c) of the parties' contract to the facts here which we believe to be, for the most part, accurate.

Paragraph 20(c) of the contract[4] provides as follows:

20. REMEDIES. Should any event of default occur and be continuing, Lessor may, without notice to or demand upon Lessee, without retaking possession of the Equipment, accelerate and cause to become immediately due and payable all rents and other sums payable under the terms hereof; OR MAY TAKE POSSESSION OF THE EQUIPMENT (WITHOUT LIABILITY TO LESSEE THEREFOR WHICH IS HEREBY EXPRESSLY WAIVED) AND EITHER ...

. . . . .

(c) SELL SUCH EQUIPMENT AT PUBLIC OR PRIVATE SALE, IN WHICH EVEN LESSEE SHALL PAY TO LESSOR UPON DEMAND THE AMOUNT, IF ANY, BY WHICH THE NET PROCEEDS MEANING CASH RECEIVED LESS EXPENSES OF SALE, REPAIR, TRANSPORTATION, COMMISSIONS AND COSTS, INCLUDING ATTORNEYS' FEES) OF SALE SHALL BE LESS THAN LESSOR'S UNRECOVERED INVESTMENT IN THE EQUIPMENT (MEANING THE TOTAL COST THEREOF INCREASED BY RECAPTURABLE TAXES AND REDUCED BY THE PORTION OF RENTALS RECEIVED NOT ATTRIBUTABLE TO LESSOR'S TAXABLE INCOME THEREFROM); ...

We agree, for the most part, with the Debtor that the proper calculation of the damages due, applying paragraph 20(c) to the facts at hand, are as follows:

| | |
|---|---:|
| Cash Received | $32,500.00 |
| (–) Expenses of Sale | 583.07 |
| Net Proceeds | $31,916.93 |
| Total Cost | $170,000.00 |
| ( + ) Adjust for Taxes | 0 |
| (–) Rentals Received | 103,870.00 |
| Unrecovered Investment | $ 66,130.00 |
| (–) Net Proceeds | 31,916.93 |
| Damages Due | $ 35,213.07 |

Some explanation of the figures plugged in per the above calculation is necessary. At the outset, we acknowledge the controlling principle that, since the contract form was drafted by Cornell, any ambiguities in interpretation of the contract must be construed against Cornell. *See, e.g., In re Community Medical Center*, 623 F.2d 864, 866 (3d Cir.1980); *Hyster Credit Corp. v. O'Neill*, 582 F.Supp. 414, 416 (E.D.Pa. 1983); and *In re Dublin Properties*, 27 B.R. 506, 507 (Bankr.E.D.Pa.1983) (per GOLDHABER, CH. J.).

Ambiguity arises from the meaning of the terms (1) "Expenses of sale ... including attorney's fees;" and (2) "Total Cost." The first term cited above has been variously interpreted by the parties as meaning attorney's fees connected with all phases of recovery of Cornell's damages, including the $2,500.00 which Mr. Hentschel testified had been paid for services which included Cornell's pursuit of its claim in this Court,[5]

---

said to constitute the law of Connecticut. *See* Annotation, *Uniform Commercial Code: Failure of Secured Creditor to Give Required Notice of Disposition of Collateral as Bar to Deficiency Judgment*, 59 A.L.R.3d 401, 409–12 (1974). *See also*, Annotation, *Failure of Secured Party to Make "Commercially Reasonable" Disposition of Collateral Under UCC § 9–504(3) as a Bar to Deficiency Judgment*, 10 A.L.R.4th 413, 422 n. 15 (1981).

3. See pages 972–73 n. 2 *supra.*

4. The entire text of paragraph 20 of the contract, as we noted *supra,* is reproduced in Judge King's Opinion at 47 B.R. 231–32; those portions which are not directly pertinent to our disposition are not reproduced here.

5. See T., at 12.

or just the services in connection with the actual resale process. We are totally unaware of the source of a further $491.08 appendage by Cornell, in its claim, to its established contention of $2,500.00 in fees. However, as Messrs. Henschel and Harding testified repeatedly concerning their own considerable efforts, without assistance of counsel, to negotiate the transaction with Superior (T., at 10–11, 13, 29), we conclude that none of the costs for attorney's fees were incurred in the sale process itself.

■■■ We agree with the observations of the court in *In re Roberts*, 20 B.R. 914, 920 (Bankr.E.D.N.Y.1982), that clauses in contracts providing creditors with attorneys' fees in certain contingencies must be "strictly construed" or such "requests fly squarely into the teeth of the American rule" that parties must generally bear their own counsel expenses. *Accord, In re Frey*, 34 B.R. 607, 611 (Bankr.M.D.Pa.1983) (per WOODSIDE, J.). Hence, consistent with the holding in *Roberts*, we are disinclined to to hold that a contract clause providing that the obligor pay attorneys' fees to the obligee to recompense the latter for its collection efforts should be broadly read to include all services connected with the collection, including services performed in pursuit of its claim in bankruptcy court. *See also In re Johnson-Allen*, 67 B.R. 968, 975–76 (Bankr.E.D.Pa., 1986).

Therefore, we shall limit the "Expense of Sale" allowable to Cornell, per paragraph 20(c) of its contract form, to $267.32 for "Repairs" and $315.75 for "Transportation," and not allow it any of its claim of $2,991.07 for "Attorneys' Fees and Costs."

The second term concerning which some ambiguity exists is "Total Cost." The Debtor equates this term with the $170,-000.00 "Price" of the equipment in the contract. Cornell, while also equating the "Price" with "Cost of Equipment," appends the sums of $49,798.53 and $5,100.00 as "Interest" and "Administrative Costs," respectively, between May 28, 1980, the date

of delivery of the equipment and June 1, 1982, the referrant to which date is unclear, to its calculation of "Total Costs."

It is true that, under the lease, the Debtor was obliged to pay a sum of $3,995.00 for rental and $239.70 for rental tax, or a total sum of $4,234.70, to Cornell for each of the sixty (60) months that it rented the equipment, which contemplates a gross total of $254,082.00 to be paid by the Debtor to Cornell for the use of the equipment throughout the full 60–month term of the parties' lease contract. However, the excess of the payment-total over the price of the equipment is nowhere designated in the lease as attributable to either "Interest" or "Administrative Costs."

On the other hand, the Debtor argues that, since the reasonable rental value of the equipment had, through obsolescence, declined to about $1,000.00 monthly as of the date of the filing of its bankruptcy Petition,[6] it overpaid the reasonable value of the equipment for each post-petition month from January, 1982, until August 14, 1982, when it allowed Cornell to retake the equipment and stopped making payments. Thus, the Debtor claims to have overpaid Cornell a total sum of $24,260.54, which it claims should be offset against the $35,213.07 owed by it to Cornell under the calculations above. This is followed by the Debtor's statement that, since the set-off exceeds the amount of the forty (40%) percent dividend due to Cornell under the Debtor's Plan, Cornell is not entitled to anything.

■■■ The answer to both parties' contentions is that paragraph 20(c) of their contract, presumably taking into account both the consideration that the "price" of the lease is stretched out over a four-year term *and* that the equipment will decline in value as it becomes obsolete, sets forth a specific means of balancing these considerations and measuring, by means of a formula, the remedies allowed to Cornell in the contingency that Cornell took posses-

---

**6.** This figure is apparently based upon Mr. Henschel's testimony that, as of September, 1982, when Cornell entered into the transaction with Superior, the monthly rentals were "roughly" $1,000.00 per month. T., at 19.

sion of the equipment on default and thereafter sold the equipment. While we are prepared to give the Debtor the benefit of all of the ambiguities present in the contract, we cannot interpret the parties' contract in such a way as to effect an alteration of the unambiguous provisions of the contract. *See Mellon Bank, V. Aetna Business Credit,* 619 F.2d 1001, 1011 (3d Cir.1980). We therefore must measure the damages by interpreting paragraph 20(c). This result is, of course, entirely consistent with Judge King's decision of March 5, 1985.

We should finally mention that we cannot agree with the Debtor that the proper procedure to determine the net amount of Cornell's claim would, in any event, be to determine its liability to Cornell, reduce Cornell's claim to the dividend that Cornell would receive under the Debtor's Plan, and then set *this* figure off against any amounts which the Debtor "overpaid" to Cornell. Any amounts which the Debtor could set off against Cornell would have to be deducted from Cornell's total claim, and the dividend computed on the net balance.

However, here, we determine that the Debtor is in fact not entitled to any setoff. We therefore determine, per our accompanying Order, that the proper amount of Cornell's claim against the Debtor is $35,213.07.