**In re Edward TASHJIAN, Debtor.**

**Bankruptcy No. 86–03409G.**

United States Bankruptcy Court,
E.D. Pennsylvania.

May 5, 1987.

James J. O'Connell, Philadelphia, Pa., Standing Chapter 13 Trustee.

Jack Miller, Philadelphia, Pa., for debtor.

Douglas H. Weiss, Philadelphia, Pa., for Marple Woods Condominium Owners Assn.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

The instant case confronts us with several issues which frequently are at the

fringes of many of the large volume of Motions for relief from the automatic stay, pursuant to 11 U.S.C. § 362, which come before us. In the instant matter, the Motion is brought by a condominium unit owners' association (hereinafter referred to as "the Association") seeking a variety of relief against a Chapter 13 Debtor who is a resident of the condominium, including (1) relief from the automatic stay to pursue "foreclosure" on a state-law-created lien for delinquent assessments and fees; (2) adequate protection for payment of common utility fees, per 11 U.S.C. § 366(b); (3) abandonment of the Debtor's interest in his condominium unit; (4) an order denying Confirmation of the Debtor's Chapter 13 Plan; and (5) conversion of the case to Chapter 7 or its dismissal. Although, at trial, the Association limited the scattergun scope of its attack to items (1), (2) and (5) above, plus a request for attorney's fees incurred in pursuing the Motion, we are herein denying all aspects of this Motion, and further indicate that we are poised to enter an Order confirming the Debtor's Plan upon receipt of a Report recommending same from the Standing Chapter 13 Trustee.

The Debtor commenced this action by filing a voluntary Petition pursuant to Chapter 13 of Title 11, U.S. Code, on July 15, 1986. On August 4, 1986, he filed his Chapter 13 Statement, Schedules, and Plan.

On December 24, 1986, the Association filed the Motion described *supra.* On January 8, 1987, the Debtor answered, generally denying most of the allegations contained therein. On January 27, 1987, the matter was scheduled for a hearing simultaneously with a hearing on the Confirmation of the Debtor's Plan. The Trustee's counsel indicated that, if the instant Motion was denied, he would recommend that the Plan be confirmed.

At the hearing, the parties attempted to recite a stipulation of facts, but this recitation broke down into several disagreements, which required some rather extensive testimony from Gail VanDyke, an employee of the Association; Kevin Callahan, Esquire, Counsel for the Standing Chapter 13 Trustee; and the Debtor. At the close of the hearing, we directed the parties to

file Briefs at two-week intervals thereafter. However, the Association subsequently ordered a Transcript and indicated that it wished to review same before briefing and therefore, by agreement of the parties, the Court entered an Order of February 6, 1987, directing that Briefs be remitted at fourteen-day intervals after receipt of the Transcript. We received the respective Briefs of the Association and the Debtor on March 20, 1987, and April 3, 1987.

Although there were some minor factual disputes, we believe that our resolution of this Motion consists primarily of applying disputed legal principles to largely undisputed facts. We are therefore preparing this Opinion in narrative form, rather than setting forth Findings of Fact, Conclusions of Law, and a Discussion, which we indicate, in *In re Campfire Shop, Inc., Barone v. Strouse, Greenberg Mortgage Corp.,* 71 B.R. 521, 524 (Bankr.E.D.Pa.1987), is our prerogative in deciding Motions.

The Debtor testified that he purchased his condominium unit in the Marple Woods Condominium, known and numbered as 106 Marple Woods Drive, Springfield Township, Delaware County, Pennsylvania 19064, in 1984 for approximately $83,500.00. As the present balance on the purchase-loan mortgage, obtained from Old Court Savings and Loan, was approximately $79,000.00, it is apparent that the Debtor made at least some downpayment in the transaction. There was no testimony contrary to his estimate of the unit's present value at $90,-000.00.

In addition to paying the mortgage, the Debtor was obliged to pay a $115.00 monthly fee to the Association. This figure included, *inter alia,* payments for common gas and water use. In addition, unit owners were charged certain additional sums to compensate for the cost of their gas heat. In the past year, Ms. VanDyke stated that the cost of the extra gas for heat consumed by the Debtor totalled $455.00.

The Debtor accumulated substantial delinquencies in his payments to the Association when he failed to make any payments between June, 1984, and April, 1986. In April, 1986, he made a payment of $398.24,

and no further payments until after the instant bankruptcy case was filed.

The Debtor had two explanations for his failure to make payments. The first was irregular income from his self-employment as a home remodeling contractor and a part-time insurance salesman, particularly during a period when he was laid off from the latter job from late 1985 until mid–1986. The second was a dispute with the Association over the removal of trash from in front of his unit. This dispute had led to litigation in the Delaware County Courts of which the end result, for the Debtor, was a string of losses, a judgment in the amount of $3,662.62 against him, and a great deal of hard feeling between him and the Association, which probably, as much as anything, explained the vigor with which the Association prosecuted this Motion.

After the filing of the bankruptcy Petition, the Debtor began remitting his monthly payments to the Association on a fairly regular basis. He also agreed to pay a sum of $300.00 to the Association in the nature of adequate assurance of payment, per 11 U.S.C. § 366(b). In August, 1986, he also commenced $500.00 monthly payments to the Trustee, which were apparently ear-marked to cure delinquencies on the Debtor's mortgage and on the Association's claims. Mr. Callahan testified that the Debtor was current on payments to the Trustee through December, 1986. However, the check drawn by the Debtor to the Association for the $300.00 payment was returned for insufficient funds. This occurrence appears to have been the "last straw," and the principal event which spurred the filing of this Motion. However, by the date of the hearing, the Debtor, who attributed the bad check to his innocent deposit of a bad check from a customer into his account, had brought the post-filing delinquency balance down to $110.46, and expressed confidence that he would eliminate the post-filing delinquency entirely shortly thereafter.[1]

On December 16, 1986, the Association filed a Secured Proof of Claim, including the judgment sum of $3,662.62; additional "condo fees and gas" of $442.36; "plus interest and attorney's fees as may be applicable."

In addition to the judgment, the Association supported its claim by citation to those portions of the Uniform Condominium Act regarding unit owners' associations, which are codified in Pennsylvania at 68 Pa.C.S.A. §§ 3301–17. In particular, citation was made to that portion of the Act providing that the Association has a lien for any assessment or fines against the owner, which may be foreclosed like a mortgage, supplemented by the Association's costs and attorney's fees. *See* 68 Pa.C.S.A. §§ 3315(a), (f).

The principal arguments of the Association are as follows:

1. The Debtor's alleged failure to make all of his post-petition payments to the Association in timely fashion, especially in light of his significant pre-petition delinquencies, are "cause" for granting relief from the automatic stay to the Association, per 11 U.S.C. § 362(d)(1).

2. The failure of the Debtor to make certain post-petition payments justifies dismissal of the case, per 11 U.S.C. § 1307(c)(4).

3. The combination of a provision of the Pennsylvania Uniform Condominium Act, 68 Pa.C.S.A. § 3315(f), a portion of the apparently voluminous By-laws of the Association, and the Debtor's "wrongdoing," justify the imposition of attorney's fees against him.

Under the facts established on this record, we find that the first and particularly the second argument are totally without merit. In light of this, we deny the Association any subsidy from the Debtor for its basically vengeful pursuit of him in this scattergun Motion, all of the slings and arrows of which miss the mark.

██ The claim under 11 U.S.C. § 1307(c)(4) is the most misplaced of the Association's argument. The Code provision in issue reads as follows:

---

**1.** Despite our reluctance to stray from the record, we cannot close our eyes to the fact that the Debtor, without contest, asserted that he had eliminated the delinquency entirely before the briefing had been completed.

(c) Except as provided in subsection (e) of this section, on request of a party in interest or the United States trustee and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title, or may dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause, including—

.    .    .    .    .

(4) failure to commence making timely payments under section 1326 of this title; ...

Because there is no other provision in § 1307(c) covering this particular subject, we assume that this statutory provision allows dismissal of Chapter 13 cases wherein the debtor not only never commences making any payments, but where he fails to continue to make such payments in regular fashion prior to confirmation. However, here the Trustee's Counsel plainly stated that the Debtor not only promptly commenced payments in August, 1986, the month after his filing, but also has continued to make payments to date. In fact, as a result, the Trustee recommended that the Debtor's Plan be confirmed.

The Association cites in support of this aspect of its Motion only one case, *In re Sando*, 30 B.R. 474 (E.D.Pa.1983). In that case, the District Court affirmed this Court's dismissal of a case, pursuant to 11 U.S.C. §§ 1307(c)(2), (c)(5), of a debtor who missed two consecutive payments to the Trustee and offered no justification for doing so. We must comment that we find the *Sando* decision extremely harsh and one that we would be unlikely to follow even on its own facts. However, here, we have much different facts. The Debtor here never missed any payments to the Trustee and provided a credible justification for his only unsuccessful attempt to make payment to the Association. Hence, this aspect of the Motion clearly must be denied.

We also find several impediments to the § 362(d)(1) aspect of the Association's Mo-

tion, any one of which might alone be fatal to it, especially since, as we have repeatedly held, the moving party has the initial burden of establishing a prima facie case, *see In re Ronald Perlstein Enterprises, Inc.*, 70 B.R. 1005, 1007 (Bankr.E.D.1987); and *In re Stranahan Gear Co.*, 67 B.R. 834, 837 (Bankr.E.D.Pa.1986), before such a valuable right as that created by the automatic stay arising from 11 U.S.C. § 362(a), *see In re Clark*, 69 B.R. 885, 889 (Bankr.E.D.Pa.1987), may be in any way modified.

▮ The first is the Association's status as an allegedly secured creditor. As we pointed out in *Perlstein, supra*, 70 B.R. at 1009; *Clark, supra*, 69 B.R. at 893; and *Stranahan Gear*, 67 B.R. at 837, valid secured status, while not a prerequisite, is a very important factor to be considered in deciding whether a moving party is entitled to relief from the automatic stay, per 11 U.S.C. § 362(d).

The Association, without ever expressly claiming secured status on any basis, apparently claims this status due to (1) its judgment against the Debtor; or (2) its lien, per 68 Pa.C.S.A. § 3315(a). We note, however, that the Debtor may be able to avoid the judicial lien under 11 U.S.C. § 522(f)(1), and could possibly avoid any alleged statutory lien under 11 U.S.C. § 545(2), (3), or (4).

The Debtor, however, has not moved to avoid the Association's lien. Rather, he merely states that the Association's contention that it is secured, and the Association's demand for a $300.00 assurance of payment per 11 U.S.C. § 366(b) [2] raise "interesting issues," and points out that the Court need not reach these issues because the Debtor is willing to treat the Association as if it were both a firmly secured party, for purpose of the § 362(d) analysis, and as a utility by paying all of the arrearages under the Plan and making a more than adequate assurance payment, for the

---

**2.** We agree that, in a perverse sense, the decision of Chief Judge Twardowski in *In re Good Time Charlie's, Ltd.*, 25 B.R. 226 (Bankr.E.D.Pa. 1982), wherein the Debtor successfully invoked § 366(a) to compel a shopping center to restore utility service, might be said to support the

conclusion that the Association is a utility entitled to an assurance of payment, per § 366(b). However, it further seems clear that the payment demanded, i.e., $300.00, to "secure" an annual extra gas heating cost of $455.00, was grossly excessive.

purpose of § 366(b). Thus, on the § 362(d) issues, the Debtor assumes *arguendo* that the Association *is* a validly secured party, and contends that it is adequately protected. Assuming *arguendo* that the Association's security interest is valid, along with the Debtor, we agree. For we believe that, even if the Association were a mortgagee,[3] and its claim a valid claim for mortgage payment arrears, it would have failed to meet the burden necessary to deprive the Debtor of his valuable bankruptcy stay.

The principal argument of the Association is that, having failed to make the pre-petition fee payments for a considerable period of time, and not having made each and everyone of his post-petition payments in timely fashion, the Debtor has given the Association the requisite "cause" to obtain relief. The Association cites to several decisions in this jurisdiction for the principle that "cause exists for relief from the stay where a debtor consistently fails to make post-petition payments." Those cases and the facts from each that we deem relevant, are as follows: *Ukranian Savings & Loan Ass'n v. Trident Corp.*, 22 B.R. 491 (E.D. Pa.1982) (Debtor failed to make any mortgage payments for over fourteen months after filing); *In re Lexington Raquetball Club, Inc.*, 58 B.R. 103 (Bankr.E.D.Pa. 1986) (Debtor failed to make pre-petition mortgage payments for three years, and apparently was not offering to resume payments post-petition); *In re Tainin*, 48 B.R. 250 (Bankr.E.D.Pa.1985) (Debtor failed to make fifteen pre-petition mortgage payments an six post-petition mortgage payments); *In re Frascatore*, 33 B.R. 687 (Bankr.E.D.Pa.1983) (Debtor made two out of eleven post-petition mortgage payments); *In re Galbraith*, 19 B.R. 563 (Bankr.E.D.Pa.1982) (Debtors were two years in arrears on their mortgage and had no equity in the premises); *In re Anderson*, 9 B.R. 248 (Bankr.E.D.Pa.1981) (Debtors never made any payments on mortgage and their only "defense" was

that they had converted their case to Chapter 7); and *In re Rush*, 9 B.R. 197 (Bankr. E.D.Pa.1981) (Tenant in private housing[4] unsuccessfuly argued that her bankruptcy, having discharged her pre-petition rent, stayed her eviction as long as post-petition rents were paid).

■ For two reasons, we reject the argument of the Association. First, we believe that determination of whether a secured lender received "adequate protection" from a debtor requires an analysis of all of the relevant facts, with a particular focus upon the value of the collateral, the likelihood that it will depreciate or appreciate over time, the prospects for successful reorganization of the Debtor's affairs by means of the Plan, and the Debtor's performance in accordance with the Plan. *See In re Grant Broadcasting of Philadelphia, Inc.* (First Opinion), 71 B.R. 376, 384–89 (Bankr.E.D.Pa.1987). While of course the last element requires some analysis of the Debtor's payment performance, this element should not, as the Association apparently suggests, be isolated from the other elements and utilized alone as a basis to deprive a debtor of one of the most valuable tools with which the bankruptcy filing equips him or her.

■ Secondly, the post-petition payment history of the Debtor here is much more impressive than those of the debtors in any of the foregoing cases, except perhaps in the *Rush* situation. Moreover, since the debtor there had no equity nor any federal constitutional right to retain her premises, that fact-setting is clearly distinguishable from that of the instant case. *Compare In re Adams*, 27 B.R. 582 (D.Del.1983) (per STAPLETON, J., when he was District Judge prior to appointment to Court of Appeals) (equity cushion prevents relief from stay against debtor who made no payments to secured creditor during course of bankruptcy). Post-petition payment behavior is not, therefore, conclusive

---

3. We also note some uncertainty as to whether the Association is subject to, and has proceeded in accordance with, Act No. 6 of 1974, 41 P.S. §§ 403, 404, since 68 Pa.C.S.A. § 3315(a) indicates that the lien "may be foreclosed in like manner as a mortgage on real estate."

4. Had the housing in issue been public housing or federally subsidized housing, different consequences may have ensued. *See In re Sudler, Sudler v. Chester Housing Authority*, 71 B.R. 780, 786–87 (Bankr.E.D.Pa.1987).

and a debtor's pre-petition payment behavior is relevant only insofar as it would suggest that equally unimpressive post-petition payment behavior will ensue. However, it must be recalled that poor pre-petition payment histories are systematic of most debtors and hence this factor is, in itself, of very limited relevance. Moreover, here, the Debtor's bankruptcy filing and the discipline required to confirm to the terms of his Plan has obviously enhanced his sense of fiscal responsibility. While his remittance of a bad check represents a lapse to some degree, it must be recalled that this sum was remitted on account of the questionable § 366(b) payment, that his own receipt of a bad check from a customer was the underlying cause of the Debtor's apparently innocent issuance of a bad check in turn, and that the Debtor ultimately made up the payment missed. We believe that the spirit of a bankruptcy court is to be permissive to isolated debtor lapses which are reasonably explained, and not to respond harshly to a debtor's failure to make a payment in strict accordance with even the Debtor's own Plan. We believe that this spirit pervades the decision of Chief Judge Twardowski of this Court in *In re Pizzullo*, 33 B.R. 740 (Bankr.E.D.Pa. 1983), where it was held that a debtor's having missed three post-confirmation mortgage payments was not such a "material default" as to constitute "cause" for relief from the automatic stay. *Accord: e.g., In re Durben*, 70 B.R. 14 (Bankr.S.D. Ohio 1986). Of course, the Debtor here was not even three months in default.

■ Finally, we address the issue which, at the close of the hearing, we understood the Association to be pressing, among its contentions, the most vigorously, *i.e.*, its claim that it was entitled to attorney's fees from the Debtor as compensation for its preparation and litigation of this Motion.

Since the Motion is, by virtue of this Opinion, pronounced unsuccessful in every sense, it may seem difficult to comprehend any basis of the Association to seek attorney's fees in connection with it. The Association, however, presents an argument, unsupported by any authority, that it should be awarded such fees upon a hypothesis that, had it not stimulated the Debtor to perform by filing this Motion, he would not have performed, and therefore it should be compensated for taking steps necessary to assure the Debtor's performance.

There is a quick response to this last point. The simple fact is that the Association filed its Motion at a very early stage, before any pattern of the Debtor's material post-petition defaults had or could have developed. The Court has no way of knowing what the Debtor would have done had the Association not filed its Motion, and we are certainly not prepared to speculate on the unknown and unknowable to the Debtor's disadvantage. If the Association chose to proceed swiftly—we might say prematurely—it certainly was in its rights to do so. However, it is not equitable to thrust the cost for so proceeding upon the Debtor on such a speculative basis.

Our most recent decision wherein we addressed claims of a creditor for attorneys fees against a debtor was *In re Jablonski*, 70 B.R. 381, 388–90 (Bankr.E.D.Pa.1987). There, we held that a mortgagee, to be entitled to a claim of attorneys fees against a debtor-mortgagor, must establish that such fees are (1) allowable under the terms of § 506(b); (2) provided for in the parties' agreement; (3) reasonable; and (4) allowable under pertinent state law. *Id.* at 388–89. However, in *Jablonski*, it must be recalled that we were addressing the issue of a creditor's right, as specifically provided by contract, to claim attorneys fees incurred in pre-petition collection activity. We were *not* discussing the right of a creditor to enhance the sum allowable in a claim, per § 506(b), by allowing fees, not specifically provided by contract, for services performed in the bankruptcy court. The latter subject, we addressed more directly in our previous decision in *In re United Nesco Container Corp.*, 68 B.R. 970, 974 (Bankr.E.D.Pa.1987), where we stated as follows:

> We agree with observations of the court *In re Roberts*, 20 B.R. 914, 920 (Bankr.E.D.N.Y.1982), that clauses in contracts providing creditors with attorneys' fees in certain contingencies must be "strictly construed" or such "requests

fly squarely into the teeth of the American rule" that parties must generally bear their own counsel expenses. *Accord, In re Frey,* 34 B.R. 607, 611 (Bankr.M.D.Pa.1983) (per WOODSIDE, J.). Hence, consistent with the holding in *Roberts,* we are disinclined to hold that a contract clause providing that the obligor pay attorneys' fees to the obligee to recompense the latter for its collection efforts should be broadly read to include all services connected with the collecting, including services performed in pursuit of its claim in bankruptcy court. *See also In re Johnson-Allen,* 67 B.R. 968, 975–976 (Bankr.E.D.Pa.1986).

■ We reiterate this statement, and clarify it by explaining that, only in extraordinary situations, such as where legally unjustifiable conduct of a party or counsel for a party is established, or where the debtor requests some extraordinary dispensation, would we grant attorneys fees to counsel for the opposing party for his services in bankruptcy court. A contrary result would be inconsistent with not only the "American rule," as we indicated in *United Nesco,* but our frequently-reiterated view that we will allow attorneys fees and costs only where the Code specifically allows same. *See, e.g., In re National Paragon Corp.,* 68 B.R. 337, 340–41 (Bankr.E.D.Pa. 1986); and *In re Jennings,* 67 B.R. 106, 109–10 (Bankr.E.D.Pa.1986). Examples of such "extraordinary dispensations" are suggested by such circumstances as those described in *In re Young,* 70 B.R. 968, 972 (Bankr.E.D.Pa.1987) (fees may be awarded where party seeks reopening of a case after opposing party has expended sums in reliance of closing); and *In re Durkalec,* 21 B.R. 618 (Bankr.E.D.Pa.1982) (fees awarded as a condition for reviving automatic stay where opposing party has expended sums in reliance of stay's termination).

Here, where the creditor's Motion has no merit, we can hardly find the presence of any extraordinary situation which would suggest that the Association is entitled to be compensated by the Debtor for the attorneys fees which it may have incurred for services in the bankruptcy court in pursuit of it. Therefore, the only conceivable basis to grant such an award to the Association would be on the basis of § 506(b) and the criteria set forth in *Jablonski.*

We start, as we did in *Jablonski,* with a careful analysis of § 506(b), which provides as follows:

> (b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

In *Jablonski,* the stipulated record was a sufficient basis to support a conclusion that we had before us a creditor who held an over-secured claim, which is a threshold prerequisite to bring § 506(b) into play. Here, there is some doubt as to whether the Association's claim is validly secured, let alone over-secured. Although we believe that the answer to the question of whether the Association's status as a validly secured claimant is unclear, and that no basis other § 506(b) exists in the Code to support a claim for such fees, we will assume *arguendo,* in the remainder of our analysis, that the Association's claim is over-secured.

Next, we must study the parties' contract to determine whether it authorizes any such claim. Among the by-laws of the Association, which it is by no means clear is other than an adhesion-contract provision buried in voluminous documents to which it is extremely doubtful that the Debtor knowingly agreed, is Section 14.6, which provides as follows:

> *Section 14.6. Personal Liability of Unit Owners.* All sums assessed by the Association as an Annual or Special Assessment, together with interest thereon at the then maximum rate set forth in Section 3314(b) of the Act, from the thirtieth (30th) day following adoption of the resolution fixing such Assessment or from such date or dates (in the case of Assessments payable in installments) as may be provided in such resolution, and

any late charges that may be levied by the Association, shall constitute the personal liability of the Owner of the Unit so assessed and also shall, until fully paid, constitute a lien against such Unit pursuant to Section 3315 of the Act. The Association may take action for failure to pay any Assessment or other charges on the date on which it is due. The delinquent Unit Owner shall be obligated to pay *(i) all expenses of the Executive Board, including reasonable attorneys' fees, incurred in the collection of the delinquent Assessment by legal proceedings or otherwise,* and (ii) any amounts paid by the Executive Board for taxes or on account of superior liens or otherwise to protect its lien, which expenses and amounts, together with accrued interest, shall be deemed to constitute part of the delinquent Assessment and shall be collectible as such (emphasis added).

As we indicated in *Jablonski,* 70 B.R. at 389; and *United Nesco,* 68 B.R. at 974, we must construe adhesion contracts drafted by the party with the far more powerful bargaining position strictly against such parties. We believe that a fair reading of this provision confines imposition of expenses, including attorneys fees, upon unit owners only in "collection" activities. We do not classify motions for relief from the automatic stay as "collection" activities. *See In re Johnson,* 756 F.2d 738 (9th Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 85, 88 L.Ed.2d 72 (1985); and *In re Schwartz,* 68 B.R. 376, 384 (Bankr.E. D.Pa.1986). Therefore, we conclude that this provision does not support the Association's demand, and it must fail.

We hence conclude that the parties' contract does not justify these charges and hence that § 506(b) does not, in any event, authorize the fees requested. We also note that 68 Pa.C.S.A. § 3315(f), which provides as follows, does not enhance the merit of the Association's claim:

(f) Costs and attorney's fees.—A judgment or decree in any action or suit brought under this section shall include

costs and reasonable attorney's fees for the prevailing party.

This provision authorizes attorneys fees only in a state court "lien foreclosure" proceeding, as described in § 3315(a). It does not address a claim for attorneys fees in any other context, such as in pursuit of the Motion in issue.[5]

Finally, under the instant circumstances, where the Association has pursued a rather apparently futile and unnecessary Motion, we would be hard-pressed to find any requested fee "reasonable."

We therefore conclude that, both legally and equitably, our response must be to deny the Association's Motion in all of its various aspects. As we indicated at page 972 *supra,* we do not perceive the Association's Motion to set forth any just impediment to Confirmation of the Debtor's Plan. Unfortunately, we do not have any Report from the Trustee other than his verbal indication that he assents to same. We will therefore request the Trustee to issue his Report and, upon receipt of same, barring any impediments which have come to his attention subsequent to the hearing, we shall approve it and shall proceed to enter an Order confirming the Debtor's Plan.

---

5. The Debtor also argues that Act 6 of 1974, if applicable, *see* page 973 n. 3 *supra,* would limit the Association's fees to no more than $50.00.

*See* 41 P.S. §§ 404(b)(3), 406(3); *Schwartz, supra,* 68 B.R. at 377–79; and *In re Cervantes,* 67 B.R. 816, 820–21 (Bankr.E.D.Pa.1986).