**In re JOSHUA SLOCUM, LTD., a Delaware Corporation, Debtor.**

**In re JOSHUA SLOCUM, LTD., a Pennsylvania Corporation, Debtor.**

**Bankruptcy Nos. 88–14082S, 88–14083S.**

United States Bankruptcy Court, E.D. Pennsylvania.

Aug. 1, 1989.

---

Melvin Lashner, Philadelphia, Pa., trustee.

J. Scott Victor, Jeffrey D. Cooper, Philadelphia, Pa., for trustee.

James W. Adelman, Philadelphia, Pa., for Creditors' Committee.

David L. Pollack, David I. Grunfeld, Philadelphia, Pa., for Landlords.

Robert Burrick, Warshaw, Burnstein, Cohen, Schlesinger & Kuh, New York City, for debtor.

James J. O'Connell, Philadelphia, Pa., Asst. U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION.

Before us is a sequel to particularly the second of our two previous Opinions, published at 99 B.R. 250 (hereinafter "Opinion I") and 99 B.R. 261 (hereinafter "Opinion II"), concerning the rights of the lessors in the wake of the assumption and assignment of certain of the Debtors' store leases by the Trustee of the Debtors in these related Chapter 11 cases. The three lessors, whose unsuccessful motion to stay our entry of Orders confirming their bids on March 8, 1989, was addressed in Opinion II, CHERRY HILL CENTER, INC. (hereinafter "CH"), COLUMBIA MALL, INC. (hereinafter "Columbia"), and THE ROUSE COMPANY OF THE DISTRICT OF COLUMBIA (hereinafter "Rouse") (collectively hereinafter "the Landlords"), dispute the sums due to them on account of their leases. The Trustee proposed to pay the sums

due to them by deducting same from the respective successful bids through which they purchased the Debtors' rights under these leases.

The Trustee contends that payments for rent and only that rent falling due prior to March 9, 1989, could possibly be credited to the Landlords by operation of 11 U.S.C. § 365(b)(1). While we disagree with this contention, we hold that the Landlords had the burden of establishing their rights to payment for the elements in dispute: liquidated damages for store "black outs;" rent for any periods subsequent to March 8, 1989; interest and late charges; common area charges; and attorney's fees. We find that only CH and Rouse met this burden and only with respect to their claims for interest and late charges. We therefore conclude that the respective Landlords are liable to pay the Trustee the following amounts: CH—$10,563.46; Columbia— $55,021.64, less a $10,000 deposit; and Rouse—$25,354.41, less a $3,000 deposit.

### B. PROCEDURAL HISTORY.

The general procedural history through April 27, 1989, of these jointly-administered voluntary Chapter 11 cases, filed on November 21, 1988, is recited in Opinion I, 99 B.R. at 251–52; and Opinion II, 99 B.R. at 262–63, and will not be repeated here. The Orders accompanying Opinion II, dated April 27, 1989, each contained the following clauses, which are the bases of the instant dispute:

4. ... the Trustee and/or Debtors' Estate shall have no liability whatsoever with regard to the Lease from and after March 9, 1987 [sic—should be 1989].

.    .    .    .    .

7. Within five (5) days from the date of this Order, [the Landlord], as Assignee, shall pay to the Trustee the sum of ..., which sum represents the full bid price of ... less a ... deposit, less a sum representing the agreed upon arrearages due under the lease including the prorata share of rent due and owing in accordance with the lease for the period March 1, 1989 through March 8, 1989.

9 [sic—should be 8]. In the event that the Trustee and the Landlord cannot agree on the total arrearages to be paid by the Trustee from the Debtor's estate, then either party may file a Praecipe to schedule a hearing to determine the said total arrearages.

On May 2, 1989, the Landlords filed a Praecipe in this court pursuant to the last paragraph of the aforesaid Orders. They also appealed the Orders accompanying Opinion II to the district court on May 5, 1989. On June 7, 1989, the instant dispute came before us for a hearing. Pursuant to an agreement by the parties, we accepted a Stipulation of Facts from them as the entire record in these contested matters and allowed the parties to simultaneously file Opening and Reply Briefs on or before June 14, 1989, and June 19, 1989, supporting their respective positions. The latter dates were subsequently extended by agreement until June 30, 1989, and July 10, 1989, respectively.

The Stipulation of Facts remains the only record in these matters. In its text, the Stipulation sets forth the agreed bids and rental arrearages as to each of the Landlords as of March 8, 1989. For each of the Landlords, it also recites figures for rent due between March 9, 1989, and March 31, 1989; common area expenses; post-petition interest and late charges; attorney's fees; and liquidated damages pursuant to "black out" clauses, measuring such damages as $50 per hour per the CH and Columbia leases and $100 per hour per the Rouse lease. Attached are several pages of calculations of the amounts due, portions of the parties' leases, and the complete riders thereto. The portions of the leases attached are confined to the liquidated damages clauses and a few surrounding lease portions.

### C. WHILE THE LANDLORDS' DEMANDS UNDER 11 U.S.C. § 365(b)(1) CANNOT BE CONFINED SOLELY TO RENTAL ARREARS, THEY HAVE THE BURDEN OF PROVING THAT THE ADDITIONAL SUMS WHICH THEY CLAIM ARE IN FACT DUE TO THEM.

The Code section pertinent to the matters before this court is 11 U.S.C. § 365(b)(1), which provides as follows:

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contact or lease.

The Landlords' claim for liquidated damages due to the Debtors' "black outs" are by far the largest sums in issue. As to CH, the claim under this clause is $81,400 and the other matters in dispute total $17,-048.57; as to Columbia, the claim under the anti-"black out" clause is $13,800 and the other matters total $2,860.90; as to Rouse, the respective figures are $18,000 for liquidated damages and $5,524.56 for the other disputed matters. These figures may explain why the Landlords chose to place only the liquidated damage clauses of the pertinent leases in the record.

■ The initial contention of the Trustee regarding the liquidated damage clauses, which he appears to apply to his attacks on the Landlords' other claims as well, is that the language of § 365(b)(1)(B), confining compensation due to the obligee of an executory contract to "actual pecuniary loss to such party," precludes any sort of claim not directly related to delinquent rent. We do not agree with such a broad, generalized attack on any element of the landlords' claim, including the claim of damages for the Debtors' breach of the "black-out" clauses. Rather, we believe that an obligee is entitled to any elements of damages, pursuant to § 365(b)(1), that it is able to prove, that is authorized by the parties' agreement (here, the leases), and that is reasonable. Therefore, we do not believe

that exclusion of any of the Landlords' claims, as a matter of law, is proper.

■ On the other hand, we believe that the phrasing of § 365(b)(1)(B) clearly indicates that the obligee has the burden of proving the sums of the compensation and other pecuniary losses to which it is entitled under § 365(b)(1).

We have not had the occasion to discuss the relative burdens of proof of the debtor and an obligee of an executory contract which the Debtor proposes to cure under § 365(b)(1) in the past, nor does this issue appear to be a general subject addressed directly in any reported case. The issue becomes important here because the parties have chosen to present us with an extremely fragmented record, particularly since the relevant lease provisions are omitted as to all but the "black out" clauses. However, we have little doubt that the burden of proof falls squarely upon the obligee to prove all elements of compensation and damages for pecuniary loss to which it is entitled by a preponderance of the evidence. This is the ordinary allocation of the burden of proof upon the party whose stance is that of plaintiff in a contested matter.

We have frequently considered claims for attorney's fees, *see, e.g., In re United Nesco Container Corp.,* 68 B.R. 970, 973–74 (Bankr.E.D.Pa.1987); and *In re Nickleberry,* 76 B.R. 413 (Bankr.E.D.Pa.1987); late charges, and other penalties, *see In re Jordan,* 91 B.R. 673 (Bankr.E.D.Pa.1988); and elements of costs, *see, e.g., In re Garnett,* 99 B.R. 293 (Bankr.E.D.Pa.1989); *In re Vitelli,* 93 B.R. 889, 897–901 (Bankr.E.D.Pa.1988); and *In re Smith,* 92 B.R. 127, 132–33 (Bankr.E.D.Pa.1988), *rev'd in part on other grounds sub nom. Smith v. Kissell Co.,* 98 B.R. 708 (E.D.Pa.1989), in the context of objections to proofs of claims. We set forth the relative burdens of proof of the debtor and the claimant in the context of objections to proofs of claim in *In re Lewis,* 80 B.R. 39, 40–41 (Bankr.E.D.Pa. 1987). There, we emphasized that, if the objector presents evidence tending to disprove the objection, the otherwise-extant presumption that the claim is *prima facie*

allowable vanishes. *Id.* at 41. *See also Jordan, supra,* 91 B.R. at 683–84; and *In re Celona,* 90 B.R. 104, 108–09 (Bankr.E.D. Pa.1988), *aff'd sub nom. Celona v. Equitable Nat'l Bank,* 98 B.R. 705 (E.D.Pa. 1989). However, the obligee to an executory contract, like a plaintiff in a lawsuit, is accorded no initial presumption of the validity of his claim for compensation under § 365(b)(1) running in his favor, as is a creditor filing a proof of claim. Therefore, it was incumbent upon the Landlords here to prove every element of their entitlement under § 365(b)(1) by a preponderance of the evidence. This is especially true when it is recalled that the Landlords are obviously the parties with the most knowledge of, and hence best able to prove, their own pecuniary losses due to the Debtor's conduct. *Compare Jordan, supra,* 91 B.R. at 684 (loan company has burden of proving its right to late charges, even in the context of a rather vague objection to its proof of claim including such charges).

Having established that the burden of proving each element of their entitlements under § 365(b)(1) is squarely upon the Landlords, we may now analyze each element of their demands. Only the bids and the respective rentals due up to March 8, 1989—as to CH, $36,000 and $22,612.29; as to Columbia, $75,000.00 and $17,117.46; and as to Rouse, $48,000.00 and $16,536.24, respectively—are agreed to by the parties.

D.  OF THE LANDLORDS' CLAIM AS TO AMOUNTS DUE IN ADDITION TO RENT THROUGH MARCH 8, 1989, THEY HAVE MET THEIR BURDEN OF PROOF NECESSARY TO ALLOW RECOVERY ONLY AS TO THE INTEREST AND LATE CHARGES CLAIMED BY CH AND ROUSE.

1. LIQUIDATED DAMAGES FOR VIOLATION OF ANTI–"BLACK OUT" CLAUSES.

■ Included in the record are clauses in each of the three leases providing that the tenants shall pay, as liquidated damages, certain sums to the respective landlords for each hour they are not open for business. There is apparently no dispute that the Debtors were not in business during certain extended periods, and, if the clauses are enforceable, the parties agree that the Landlords would be entitled to recover the substantial amounts set forth on page 605 *supra.*

The Trustee points out that, like the liquidated damages provision considered by the court and held unenforceable in *In re Food City, Inc.,* 95 B.R. 451 (Bankr.W.D. Tex.1988), it is not the Debtors' failure to pay the liquidated damages set forth in the leases that constitutes the alleged default, but rather the act of letting the stores "go dark" or "black out." Consequently, he argues, it should be for this court to determine the reasonable measure of damages for violation of these lease provisions, if any. In support of his argument that the liquidated damages are arbitrary and do not bear a reasonable relation to the damage done, the Trustee notes the disparity between the fifty ($50.00) dollar per hour rate in the CH and Columbia leases and the one hundred ($100.00) dollar hourly rate in the Rouse lease.

The Landlords argue that there is in fact a reasonable relationship between the liquidated damages allowable and the consequences of the "blackout" clause breach by the Debtors. However, they in fact presented no evidence in the record by which we could determine the accuracy of this contention. In *Opinion I,* 99 B.R. at 259, we cited two cases where the landlord "failed to prove any detriment to himself or his other tenants as a result of the Debtor's 'black out.'" The reasoning of the first case, *In re Connellsville Plaza v. Jiffy Foods Corp.,* 92 B.R. 136, 138 (W.D. Pa.1988), is inapplicable because the court there held, unlike here, that the vacancy in that case was permitted under the "remodelling clause" of the lease. The facts of the second, *Food City, supra,* are different because, there, the liquidated damages provided for in the lease were a one-time charge of $250,000, rather than, as here, a graduated charge dependent on the duration of the black-out. Certainly, the draconian amount due in the *Food City* lease is

more obviously an unenforceable penalty than the comparable provisions in these leases.

■ However, even a modest measure of liquidated damages which is not established to be proportionate to the injury that has actually occurred cannot be collected if it is found to be a penalty. *See Jordan, supra,* 91 B.R. at 680, and cases cited therein. The Landlords have not adduced any evidence that the rates called for bear any reasonable relationship to the actual damages which the Landlords suffered, or that they have suffered any damage at all, as a result of the Debtors' "black outs." *Compare Food City, supra,* 95 B.R. at 452–53 (landlord had previous "bitter experience" of a tenant's "going dark," which prompted the inclusion of this clause; here, no such experiences are recited). Therefore, the liquidated damages sought by the Landlords under their leases for "black outs" are not "pecuniary losses" which must be repaid to them by the Trustee under § 365(b)(1).

### 2. POST–MARCH 8, 1989 RENT

■ Neither party cited any cases addressing the subject of whether the Debtor, having been obliged to pre-pay all of March's rent on March 1, 1989, per the leases, was excused from liability for rent falling due subsequent to March 8, 1989, the day of the bidding and "sale" of the leases. We believe that the reason for lack of general authority on this point is that its resolution is strictly fact-determinative. The terms of the sale of a debtor's leasehold rights should dictate the date through which the debtor is liable, and the buyer of the leasehold rights should be obliged to pay the rent thereafter. Indeed, here, these terms were clear. At the March 8, 1989, sale, it was announced that the buyers were obliged to pay all rents falling due after March 8, 1989. The dispute apparently arises here only because the Landlords were also buyers.

Furthermore, as to these very leaseholds in issue, this court has already held that the Debtors, and hence the Trustee, were only liable for rent through the date of the

March 8, 1989, hearing. Our Orders of April 27, 1989, accompanying Opinion II, *see* page 604 *supra,* expressly absolved the Debtors from any responsibility to pay rent for dates after March 8, 1989. Paragraph four of each order provided "[t]hat the Trustee and/or Debtor's estate shall have no liability whatsoever with regard to the lease from and after March 9, 1987 [sic— 1989]." Paragraph seven of each Order provided that the parties shall pay the Trustee the bid price less "a sum representing the agreed upon arrearages due under the lease including the pro rata share of rent due and owing in accordance with the lease for the period March 1, 1989, through March 8, 1989." Further, we reiterated that the Debtors were committed to pay rents, through only March 8, 1989, in the text of Opinion II, 99 B.R. at 264. Thus, the Opinion and Orders of April 27, 1989, all state, in three separate places, that the Debtors (and hence the Trustee) were only responsible for the rent and any other allowable expenses through the date of assignment, *i.e.,* March 8, 1989.

Consequently, collateral estoppel, as well as these numerous statements of the conditions of the sale, precludes the Landlords' claims for post-March 8, 1989, rentals.

### 3. ATTORNEYS' FEES

■ Each of the Landlords claims a relatively modest sum for attorneys' fees through March 8, 1989: CH—$1,679.57; Columbia—$1,735.67; and Rouse— $1,558.67. There is an abundance of authority addressing claims for attorneys' fees under § 365(b)(1).

Here, again, however, we are confronted with a serious evidentiary obstacle to awarding such an element of damages to the Landlords. We have found only one case holding that § 365(b)(1) authorizes an award of attorneys' fees to the landlords' counsel without regard to the terms of the lease. *In re Westworld Community Healthcare, Inc.,* 95 B.R. 730 (Bankr.C.D. Cal.1989). The respective records in all of the other cases we found considering attorney fees under § 365(b)(1) included lease provisions allowing attorneys' fees in cir-

cumstances established to be present, and the courts limited recovery to the terms of the lease provisions. *See In re Diamond Head Emporium, Inc.*, 69 B.R. 487 (Bankr. D.Haw.1987); *In re Westview 74th Street Drug Corp.*, 59 B.R. 747 (Bankr.S.D.N.Y. 1986); *In re Ribs of Greenwich Village*, 57 B.R. 319 (Bankr.S.D.N.Y.1986); *In re Foreign Crating, Inc.*, 55 B.R. 53 (Bankr.E.D. N.Y.1985); *In re J.W. Mays, Inc.*, 30 B.R. 769 (Bankr.S.D.N.Y.1983). While *Foreign Crating* seems to suggest that § 365(b)(1)(B) alone requires attorney fees to be reimbursed, the holding actually was "pursuant to a lease provision that provides for attorney's fees....." 55 B.R. at 54.

■ The results in these latter cases are in keeping with the "American rule" regarding a litigant's duty to pay even a successful opponent's attorneys' fees: each party bears its own costs of litigation, absent a *specific* contractual or statutory provision to the contrary. *See United Nesco, supra*, 68 B.R. at 974. Without evidence of a particular lease provision reciting precisely in what circumstances a landlord's attorneys' fees are recoverable, it is impossible to ascertain whether a circumstance justifying collection of such fees is in fact present or whether such a clause is unenforceable as an adhesion contract. *See Garnett, supra*, 99 B.R. at 296–97; and *United Nesco*, 68 B.R. at 973–74. We join those courts that hold that § 365(b)(1)(B) does not create a statutory right to recover attorney fees, and the record before us (consisting entirely of the Stipulation, per our Order of June 7, 1989) does not include any provisions in the leases justifying such charges. Therefore, we are unable to require the Trustee to pay the attorneys' fees of the Landlords as a condition of assuming the lease.

■ Even assuming *arguendo* that such provisions do exist, but were omitted from the record on the assumption that the Trustee implicitly stipulated to their existence, as the Landlords seem to argue in their Reply Brief, we note that no pre-petition actions to remedy the Debtors' defaults appear to have been instituted, and the Landlords hence appear to be seeking attorneys' fees for their counsel's services in this bankruptcy court. We have expressed "our distinct disinclination" to pass through attorneys' fees expended by a creditor for services of counsel in bankruptcy court litigation to debtors. *Garnett, supra*, 99 B.R. at 296–97. *See also Vitelli, supra*, 93 B.R. at 894–97; and *Nickleberry, supra*, 76 B.R. at 423–26. Furthermore, we note that only *reasonable* attorneys' fees are allowable in any event. *See Nickleberry, supra*, 76 B.R. at 421 n. 11. Thus, even if we had statutory or contractual authority to award the fees, we would still have to evaluate the reasonableness of the fees sought by the Landlords here. Some detail of the services performed, time expended, and hourly rates of counsel, akin to that required under the standards *In re Meade Land & Development Co., Inc.*, 527 F.2d 280 (3d Cir.1975), would be necessary to justify the Landlords' fee demands here, since the payments to the Landlords will be made from the proceeds of the debtor-estate. No detail is provided. For all of these reasons, then, this claim must be rejected.

### 4. COMMON AREA CHARGES

■ The Landlords claim that "[i]t is undisputed that Debtor [sic] is responsible for [common area] charges as part of the rent obligation under the leases...." Landlords' Opening Brief in Support of Claims for Arrearages (hereinafter "Landlords' Brief"), at 4. Yet, the Trustee begs to differ: "The Trustee disputes the obligation of the Debtor's Estate to pay the sum of $11,529.19 as Common Area charges." Memorandum of Law in Support of Trustee's Position Concerning the Total Arrearages Assumed, etc. (hereinafter "the Trustee's Brief"), at 21. As a preliminary matter, we have no choice but to agree with the Trustee that the common area charges *are* disputed.

In resolving this dispute, we searched the excerpts of the leases incorporated into the stipulation. We found no clause there requiring the Debtors' payment of common area charges, and, in line with our earlier

discussion of the allocation of the burden of proof as to the justification for any charges upon the Landlords, we must find for the Trustee on this issue. The Landlords have failed to adduce any evidence that the Debtor's leases require the payment of such charges, and, absent such evidence, this court cannot try to guess that such provisions exist but were erroneously omitted from the record.

### 5. LATE CHARGES AND INTEREST

■ We think a conclusion different from total rejection of the Landlords' claim is required only as to their claims for interest and late charges. Intuitively, we must note that obligors' untimely payments result in losses to obligees. *Cf. Garnett, supra,* 99 B.R. at 296–97. (fairness of a particular charge for which reimbursement is sought by a creditor is particularly relevant). As the Landlords point out in their Brief, they are not the Debtors' bank, and, if Debtors had to borrow money from a bank, they would have had to pay interest on it. Landlords' Brief, at 6.

In the recent case of *In re Melbell Associates, Inc.,* 99 B.R. 31 (Bankr.E.D.Cal. 1989), the bankruptcy court found late charges of four (4%) percent of the monthly payments and interest at the contract rate of 9.75% to be "reasonable" within the meaning of 11 U.S.C. § 506(b), and allowed the oversecured creditor to recover both from the proceeds of a sale of the debtor's rights therein. In *In re Tech Hifi, Inc.,* 49 B.R. 876 (Bankr.D.Mass.1985), the court allowed the landlord interest because it was provided for in the lease. In *Diamond Head, supra,* the court allowed interest on late rent at ten (10%) percent per annum pursuant to a provision in the lease. The courts in *Westview, supra,* 59 B.R. at 757; and *J.W. Mays, supra,* 30 B.R. at 772, as the Landlords accurately state in their Brief, required tenants to pay interest at the legal rate on overdue rent. On the other hand, our holdings in *Jordan, supra,* 91 B.R. at 680; and *Lewis, supra,* 80 B.R. at 43, indicate that a creditor seeking late charges or interest, even in a proof of claim, has a burden of establishing the

justification and reasonability of his computation of same upon objection thereto.

However, the landlord-tenant cases cited *supra* also emphasize that interest must be paid in order to "timely perform all the obligations of the debtor" pursuant to § 365(d)(3) and to "cur[e] ... such default" pursuant to § 365(b)(1)(A) *if* the lease contains a provision for interest, or if state law requires interest. Although the Stipulation of Facts and its attachments do not include any lease provisions addressing late charges or interest, the Trustee gratuitously quotes, in his Brief, at 19–20, Section 5.8 of the CH and Rouse leases as follows:

> The tenant who fails to make timely rental payments within seven (7) days from the due date to pay a late payment charge equal to the greater of One Hundred Dollars ($100.00) or ten percent (10%) of any rental payment not paid when due for its additional administrative costs. In addition, any rental which is not paid within seven (7) days after the same is due shall bear interest at the Default Rate from the first day due until paid.

CH is seeking $2,824.62 in late charges and interest pursuant to this Lease provision. Rouse is seeking only interest of $585.09 pursuant thereto. Columbia seeks late charges and interest of $2,860.90. However, the Trustee includes no similar quotations or references to any part of the Columbia lease which allows interest or late charges. We are therefore prepared to allow the demands for late charges and interest which they seek to only CH and Rouse and not to Columbia.

■ The only question remaining is whether the late charges provided for in these clauses are reasonably related to the actual damages of CH or Rouse or whether they are void as penalties.

The court in *Melbell, supra,* 99 B.R. at 34, found a late charge of four (4%) percent to be reasonable, in light of other cases allowing five (5%) and ten (10%) percent late charges, *e.g., Mack Financial Corporation v. Iveson,* 789 F.2d 1083 (4th Cir. 1986), and *In re Dalessio,* 74 B.R. 721 (9th Cir.BAP 1987). In light of this decision, and in light of the fact that the three leases

**610**

at issue here were apparently extensively negotiated, as evidenced by the plethora of riders, we find that the ten (10%) percent late charge in the CH lease is not unreasonable. Therefore, the full sum of late charges and interest sought by CH and Rouse will be allowed to these Landlords.

E. CONCLUSION.

We recapitulate our findings as follows:

As to CH, the Trustee agrees to payment of $22,612.29 for rental arrearages. Additionally, we find that $2,824.62 is reasonably required under the lease as interest and late charges, for a total of $25,436.91. As to Columbia, the Trustee agrees to $17,-117.46 for arrearages, and this is all that we determine that he owes. As to Rouse, the Trustee agrees to $16,536.24 for arrearages. Additionally, we find that $585.09 is required under the lease as interest, for a total of $17,121.33.

Each of these sums, plus the deposits set forth at page 604 *supra*, is to be set off against the amount bid by the respective landlords to determine the net amount the Landlords must pay to the Trustee to be assigned the leases.