**In re ORSA ASSOCIATES, INC., Debtor.**

**In re George C. DORAN, Sr., Gloria J. Doran, Debtors.**

**Bankruptcy Nos. 88–14395S, 88–14396S.**

United States Bankruptcy Court, E.D. Pennsylvania.

Oct. 25, 1989.

---

John F. Murphy, Doylestown, Pa., for debtors.

Edward Sparkman, Philadelphia, Pa., Standing Chapter 13 Trustee.

James J. O'Connell, Ass't. U.S. Trustee, Philadelphia, Pa., for U.S. Trustee.

Dexter K. Case, Reading, Pa., Karl E. Friend, Allentown, Pa., for MBA.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION.

It seems that once parties to a dispute are unable to settle it and require the initial intervention of a court to effect dispute-resolution, they are likely candidates for a return to court to resolve any other differences not totally resolved in their initial court visit. In our previous decision of April 25, 1989, subsequent to a consolidated trial of two related adversary proceedings, reported as *In re Orsa Associates, Inc.*, 99 B.R. 609 (Bankr.E.D.Pa.1989), we decided almost every issue which the parties placed before us except one, *i.e.*, the amount of the lien, if any, pursuant to 11 U.S.C. § 548(c), retained by M.B.A. Financial, Inc. (hereinafter "MBA"), against the respective properties of the related respective Debtors after we set aside the transfers of September 14, 1988, of those properties to MBA under 11 U.S.C. § 548(a)(2). *Id.* at 618, 622. Although we included a substantial number of guideposts which we hoped would lead to an amicable resolution of this final aspect of the parties' stormy relationship in that Opinion, no resolution transpired. We are, therefore, like Hollywood, frequently placed in the posture of producing sequels to our earlier works, as we are here.

In order to hopefully terminate the sequence of these disputes, we decide all of the issues between the parties which are on the present horizon, even though MBA suggests, with some justification, that the Debtors failed to put the issue of determination of its allowed secured claim properly before us by failing to expressly invoke 11 U.S.C. §§ 506(a), (d). We therefore conclude that MBA has a valid joint and several total proof of claim against each of the Debtors in the amount of $116,627.37. However, pursuant to § 506(a), we conclude that MBA has no valid secured claim against Debtor ORSA ASSOCIATES, INC. (hereinafter "Orsa") and a secured claim of only $85,000 against Debtors GEORGE C. DORAN, SR. (hereinafter referred to as "Doran") and GLORIA J. DORAN (these Debtors are collectively referred to as "the Dorans") (Orsa and the Dorans are collectively referred to as "the Debtors" throughout).

## B. PROCEDURAL AND FACTUAL HISTORY.

In an Order of September 18, 1989, entered in the course of getting these matters to a final hearing, we memorialized the parties' agreement that the record in the proceedings resolved in the previously-referenced Opinion of April 25, 1989, would be incorporated into this proceeding. Therefore, that Opinion, with its copious Findings of Fact, is a reference point for not only the procedural history of both underlying main bankruptcy cases, but of the facts underlying the present controversy. *See* 99 B.R. at 610–14. The contents of that Opinion will not be repeated here, but frequent references to it will be made where appropriate.

Very little of any significance has transpired in either Orsa's or the Dorans' main bankruptcy cases pending the resolution of the scope of MBA's claims. By an Order of June 15, 1989, Orsa has been directed to prepare a Chapter 11 Plan and Disclosure Statement on or before November 1, 1989. The Dorans have their initial Chapter 13 Plan confirmation hearing scheduled on November 2, 1989, and we will put over a pending motion of the Standing Chapter 13 Trustee to dismiss their case until then. A further brief continuance might be permitted to formulate a confirmable Plan in each case, as the resolution of the present controversy was essential to the direction of both cases.

MBA set the present sequence of events into motion by filing, on May 26, 1989, pursuant to paragraph 7 of our Order of April 25, 1989, *see* 99 B.R. at 624, Proofs of allegedly totally-secured Claims in the amount of "$170,115.32 plus $38.64 day int.," based upon the Deeds of Trust and Trustee Escrow Agreements guaranteed by the Debtors, *see* 99 B.R. at 611–12, and a Proof of Claim in the amount of $164,622.64 against the Dorans only, based upon the confessed judgment obtained against them by MBA in Maryland. *See id.* at 612–13. The latter claim was wisely withdrawn by MBA at the commencement of trial. *See id.* at 618–20; and *In re Souders*, 75 B.R. 427, 433–38 (Bankr.E.D.Pa. 1987). On June 14, 1989, and June 20, 1989, the Debtors filed almost identical comprehensive Objections to MBA's Proofs of Claims.

After continuing the hearing on the Objections twice, until September 13, 1989, by mutual request of the parties, we were faced, on that date, with a contested further continuance request by MBA on two grounds: (1) New counsel had entered appearances for MBA on September 11, 1989; and (2) That very day of September 13, 1989, Norman Tayler, a principal of MBA who had not testified in the prior trial (hereinafter "Norman"), was scheduled for hip-replacement surgery. Cognizant of the delays that this matter was causing in the administration of *two* cases, we reluctantly granted one last continuance of the hearing until October 4, 1989. However, we also provided, in the pertinent Order of September 18, 1989, that Norman's testimony, if necessary, would be added by deposition.

The trial's main feature was an itemization of the elements making up the remaining Proofs of Claims provided by testimony

of Marilyn Tayler (hereinafter "Marilyn"). Documents were produced which supported some, but not all, of Marilyn's recitation of the following items of the claims:

| | | |
|---|---|---:|
| a) | principal amount | $ 96,647.58 |
| b) | interest to 5-31-89 | 11,366.04 |
| c) | mailing invoices* | 442.50 |
| d) | printing of invoices | 3,000.00 |
| e) | recording mortgages/trusts | 1,736.74 |
| f) | copies of letters | 50.00 |
| g) | wire transfer funds* | 20.00 |
| h) | Factor's Commission to October/88 | 40,352.45 |
| i) | Ed Hughes, Esq. Atty fees** | 250.00 |
| j) | Marc Jonas Escrow Agent fees** | 1,500.00 |
| k) | Steven Beinstock, Esq. atty fees** | 4,500.00 |
| l) | Leslie Lickstein, Esq. atty fees** | 2,000.00 |
| m) | Michael Gatto, Esq. atty fees | 8,000.00 |
| n) | costs to collect per F & S agreement* | 250.00 |

$170,115.31
plus interest
at $38.64/day
from 6-1-89

\* – not supported by any documentation
\*\*– supported only by bills for total services, not itemized.

---

Upon being advised that Norman would merely have recited his rendition of meetings attended by both Marilyn and their son, Baron Tayler (hereinafter "Baron"), who were both present in the courtroom, we deemed it advisable to close the record without the supplement of Norman's deposition. The parties were accorded until October 18, 1989, to simultaneously file Briefs supporting their respective positions.

C. THE DEEDS OF TRUST EXECUTED BY THE DEBTORS IN FAVOR OF MBA CONSTITUTE "UNAVOIDABLE" SECURITY INTERESTS OF MBA AGAINST THE DEBTORS' RESPECTIVE PREMISES PURSUANT TO 11 U.S.C. § 548(c).

The Bankruptcy Code section most squarely in issue in this controversy is 11 U.S.C. § 548(c), which provides as follows:

(c) Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

Our most comprehensive discussion of this Code Section is contained in *In re Cole*, 89 B.R. 433 (Bankr.E.D.Pa.1988), which, despite the references to it in our previous Opinion, 99 B.R. at 616, 618, is not cited by either party.

The *Cole* Opinion is relevant here not only for its interpretation of § 548(c) in the context of a scenario where, like here, the transferee in a § 548(a) proceeding is also a judgment creditor, but also because it references the "law of the case" doctrine. 89 B.R. at 436. Here, we have issued a comprehensive Opinion which addressed many of the same factual issues which are significant to the instant contested matter. Pursuant to the "law of the case" doctrine, our previous factual findings finally resolved many of the disputed issues here.

In *Cole* we reiterated and further supported our conclusion in an earlier decision in the same case, *In re Cole*, 81 B.R. 326, 331-32 (Bankr.E.D.Pa.1988)[1] that the

---

1. Another sequel!

"good faith" of the judgment creditor in the transaction in which it originally obtained the transferor's obligation is the significant referrent in a § 548(c) analysis, not the circumstances of the transfer that is set aside pursuant to § 548(a). 89 B.R. at 436–37. Thus, we quoted from the earlier *Cole* decision as follows and later expanded upon that quotation:

> "*we believe that it is clear that the Mortgagee is entitled to have its lien satisfied in the sale reinstated against the premises under 11 U.S.C. § 548(c) when the sale is set aside.* We read § 548(c) as addressing solely the issue of whether the transferee or obligee, i.e., the purchaser at the sale, has a right to the lien against the Debtor's premises in light of the frustration of his bargain. It is the good faith of the purchaser which is the measure of whether a lien is warranted. *There is no suggestion in § 548(c) that a judgment creditor whose lien was satisfied in the avoided sale should not have this lien reinstated.* When a judgment creditor purchases at his own sale, he has rights in two capacities, ie., as judgment creditor and as purchaser. We believe that, pertinent to its capacity as judgment creditor, *nothing in § 548(c) suggests that it should lose its judgment lien, no matter what the circumstances of the sale were.* The question of the judgment creditor's good faith is only relevant in determining whether it is entitled to an additional lien for any outlay of value to the Debtor pertinent to its capacity as purchaser (emphasis added)."

*Id.* at 436, quoting 81 B.R. at 331–32.

We can perceive no significant distinction between the stance of the mortgagee which was the transferee at its own sheriff's sale in *Cole* and MBA's stance here as a judgment creditor who was the transferee in its "self-help execution process" which we set aside. As we mentioned in our prior Opinion, 99 B.R. at 618, MBA's stance is somewhat less certain than the *Cole* mortgagee because the Debtors here did appear to be attacking the validity of its acquisition of a security interest against the Debtors' respective properties in the first place. How-ever, our distaste for MBA's use of a "self-help execution process" is not a factor in assessing the merits of MBA's claim of such a security interest. *See id.* at 622.

MBA argues, we think effectively, that even though the transfers effected pursuant to the Deeds of Trust executed by the Debtors have been avoided, these documents constitute mortgages against the properties subject to the Deeds. *See* 21 P.S. § 921; *In re Evergreen Memorial Park Ass'n,* 308 F.2d 65, 68 (3d Cir.1962); *Payne's Adm'r v. Patterson's Adm'rs,* 77 Pa. 134, 137 (1875); *Guthrie v. Kahle,* 46 Pa. 331, 332 (1863); *Hahnemann Medical College & Hospital v. Commonwealth,* 52 Pa.Cmwlth. 558, 563–65, 416 A.2d 604, 607 (1980); and Annot., *Deed Placed in Escrow to Be Delivered to Grantee upon Failure to Pay Debt Due Them as a Mortgagee,* 65 A.L.R. 120 (1930). *Cf. In re Executive House Associates,* 99 B.R. 266, 270–74 (Bankr.E.D.Pa.1989) (under Pennsylvania law, a document containing sufficient indicia that it is a mortgage will be deemed a mortgage).

In the course of the previous adversarial proceedings, the Debtors argued that the Deeds of Trust were ineffective as documents sufficient to transfer title of their respective properties because they were improperly certified and acknowledged. However, we rejected the Debtors' attempts to set the Deeds aside on that ground, even assuming *arguendo* that the Debtors were standing in the shoes of subsequent bona fide purchasers of the property. 99 B.R. at 620–21. In light of this discussion, we would certainly be disinclined to conclude that the Deeds of Trust would be ineffective as between the parties to the documents themselves. *See In re Aikens,* 83 B.R. 344, 347–48 (Bankr.E.D.Pa. 1988).

We therefore conclude that the Deeds of Trust establish mortgages against the Debtors' respective properties. As "security interests," the mortgages created are not avoidable under 11 U.S.C. §§ 522(f)(1) (pursuant to which "judicial liens" can be avoided); or 11 U.S.C. § 545(2) (pursuant to which "statutory liens" can be avoided).

*See In re Aikens,* 87 B.R. 350, 353 (Bankr. E.D.Pa.1988).[2]

At this point, we do not understand the Debtors to be contesting that the Deeds of Trust are unavoidable obligations on their part, comparable to if not legally equivalent to mortgages. Instead, they argue that MBA's claim should be reduced to about $55,000 and that its security interest should be "stripped down" completely as to Orsa and to no more than $69,200 as to the Dorans pursuant to 11 U.S.C. § 506. These issues shall be discussed hereinafter in due course.

### D. MBA HAS FAILED TO MEET ITS BURDEN OF PROVING THE VALIDITY OF MOST OF THE SMALL COMPONENTS OF ITS CLAIM FOR COSTS AND ATTORNEYS' FEES.

In their respective Briefs, the parties come closer together from their initial positions, *i.e.,* the Objections aver that the claims should be stricken entirely and the original claims of MBA recited a figure of $170,115.31, plus interest. The Debtors allow, in their Brief, that MBA might have valid claims against them in some amount. In its Brief, MBA reduces its demands to a net sum of $130,258.87.

In our previous Opinion of April 25, 1989, we indicated a lack of receptivity to the Debtors' argument in the adversary proceedings that MBA's advances of funds to the Pennsylvania Yellow Pages by Korman, Inc. (hereinafter referred to as "PYP") which were guaranteed by the Debtors were so at variance from the underlying Factoring Agreement and Security Agreement of August 3, 1988 (hereinafter referred to as "the Factoring Agreement"), *see* 99 B.R. at 611–12, that the indemnification provisions of the Factoring Agreement pursuant to which the Debtors' liability arises were unenforceable against them. *Id.* at 622. We agree with MBA's unanswered argument that the undertakings of the parties were sufficiently in accordance with the terms of the Factoring Agreement that they created obligations which were

secured by the Deeds of Trust executed by the Debtors.

■ However, we disagree with MBA's apparent contention that the burden of proof regarding the specifics of its claim, as itemized in its Proofs of Claims, see page 421 *supra,* falls upon the Debtor. We recently stated as follows in collecting our cases relating to the burden of proof in establishing the validity of charges which are the components of proofs of claims in *In re Joshua Slocum, Ltd.,* 103 B.R. 601, 605–06 (Bankr.E.D.Pa.1989):

> We have frequently considered claims for attorney's fees, *see, e.g., In re United Nesco Container Corp.,* 68 B.R. [970] 973–74 (Bankr.E.D.Pa.1987); and *In re Nickleberry,* 76 B.R. 413 (Bankr.E.D.Pa. 1987); late charges, and other penalties, *see In re Jordan,* 91 B.R. 673 (Bankr.E. D.Pa.1988); and elements of costs, *see, e.g., In re Garnett,* 99 B.R. 293 (Bankr. E.D.Pa.1989); *In re Vitelli,* 93 B.R. 889, 897–901 (Bankr.E.D.Pa.1988); and *In re Smith,* 92 B.R. 127, 132–33 (Bankr.E.D. Pa.1988); *rev'd in part on other grounds sub nom. Smith v. Kissell Co.,* 98 B.R. 708 (E.D.Pa.1989), in the context of objections to proofs of claims. We set forth the relative burdens of proof of the debtor and the claimant in the context of objections to proofs of claim in *In re Lewis,* 80 B.R. 39, 40–41 (Bankr.E.D.Pa. 1987). There, we emphasized that, if the objector presents evidence tending to disprove the objection, the otherwise-extant presumption that the claim is *prima facie* allowable vanishes. *Id.* at 41. *See also Jordan, supra,* 91 B.R. at 683–84; and *In re Celona,* 90 B.R. 104, 108–09 (Bankr.E.D.Pa.1988), *aff'd sub nom. Celona v. Equitable Nat'l Bank,* 98 B.R. 705 (E.D.Pa.1989)....

The Debtors, in the record of the prior proceedings, presented evidence which placed the entire amount claimed by MBA in issue. Therefore, the burden of proving its entitlement to each and every charge which is a component of its Proofs of Claims was thrust squarely upon MBA. In

---

**2.** This is the first of two sequels (!) to the earlier *Aikens* Opinion cited *supra. See In re Aikens,* 94

B.R. 869 (Bankr.E.D.Pa.), *aff'd,* 100 B.R. 729 (E.D.Pa.1989).

the following discussion, we shall, for the sake of brevity in expression, refer to the specific items set forth in the proof of claim by the designation of letters assigned to them by Marilyn during her testimony, which we have reproduced at page 421 *supra*. Also, we will presume, as does even MBA in making its calculations, that its obligations are undersecured, and that therefore post-petition interest on the claim and reasonable fees, costs, and charges arising post-petition cannot be claimed pursuant to 11 U.S.C. § 506(b). We shall not, at this point, discuss any potential impact of 11 U.S.C. §§ 506(a), (d).

Item "a," the principal amount of $96,-647.58, is not in dispute.

Items "b" and "h" refer to the two components of charges which MBA makes for its services. These charges are authorized under paragraph three of the Factoring Agreement, which reads as follows:

> 3. Accounts accepted by Factor for purchase shall be purchased by Factor for a purchase price equal to the net amount of such accounts, less Factor's Commission equal to 10% of the net amount of such accounts for the first year of the term of this Agreement, 9% of the net amount of such accounts for the second year of the term of this Agreement, and 8% of the net amount of such accounts for the third year of the term of this Agreement, for Factor's services hereunder in connection with creditor investigation, collection of accounts, and otherwise, and less a further Discount computed daily at the rate of 4% per annum over the prime rate per Sovran Bank in Bethesda, Maryland, (can be adjusted weekly) but not to exceed the maximum permitted by Law, on the part of purchase price paid, from the date of purchase by factor to either, (A) the date of maturity of such accounts plus 60 days for delay in collection, or (B) the date of payment of such account, payment to mean cash in MBA's bank account, whichever ("A" or "B") is shorter. If the net amount of the accounts purchased hereunder for any month shall not equal or exceed the sum of $50,000,

then such Factor's Commission and further Discount shall be computed upon said sum rather than upon said net amount.

■ The Debtors contend that § 506(b) bars *any* claim of MBA for interest under Item "b." However, we believe that MBA accurately argues that § 506(b) does not adversely impact upon pre-petition interest charges. Therefore, while the figure included at Item "b" in the Proof of Claim, which calculates interest to May 31, 1989, and the request for interest accruing after May 31, 1989, are admittedly misplaced, MBA correctly contends that discount interest through December 16, 1988, the date of the Debtor's bankruptcy filings, *is* collectible. MBA computes this figure to be $4,519.17. Since our own calculation yields a slightly-higher figure, we will accept MBA's figure.

The parties apparently agree that accounts of PYP totalling $303,524.50 were presented by PYP to MBA for factoring under the Factoring Agreement. The Debtors claim that MBA only "accepted" $161,079.30 of these accounts because MBA only advanced $96,647.58 to PYP, of which that figure is sixty (60%) percent (the percentage of accounts factored to be remitted to PYP under the Factoring Agreement). Thus, they contend that the base commission under paragraph three of the Factoring Agreement should be only ten (10%) percent of $161,079.30, or $16,107.93. We disagree with this analysis. The $96,-647.58 was in the nature of an initial advance to PYP by MBA until the proper documentation for the accounts factored was supplied to it by PYP. *See* 99 B.R. at 612. MBA actually accepted and tried to work with the entire group of accounts totalling $303,524.50. Therefore, the base commission is ten (10%) percent of this sum, or $30,352.45.

MBA's demand, under Item "h," also included $10,000 which it attributes to "actual 2 months commission charged by MBA." This is apparently the $5,000 minimum set forth in the last sentence of paragraph three of the Factoring Agreement. However, it is not clear what "2 months" are

referenced, as the Factoring Agreement was effectively terminated about a month after its execution. *See* 99 B.R. at 612. In its Brief, MBA wisely abandons this claim and agrees to reduce Item "h" to the $30,-352.45 figure. We deem this figure appropriate.

MBA is on far shakier ground on all of the remainder of its claims. These break into two general categories; (1) Costs (Items "c," "d," "e," "f," "g," and "n"); and (2) Attorneys' fees (Items "i," "j," "k," "l," and "m"). We note that, in its Brief, MBA withdraws its demand as to Item "n." Also, therein, MBA reduces the total sum which it seeks for attorneys' fees from $16,250.00 to $6,965.60.

With respect to claims for both post-petition "costs" and "attorneys' fees" in proofs of claims, we have developed a four-prong test, first articulated in *In re Tashjian*, 72 B.R. 968, 974 (Bankr.E.D.Pa.1987), the burden of proving all elements of which falls upon the claimant. *See Joshua Slocum, supra*, 103 B.R. at 605–06, 607–08; *Garnett, supra*, 99 B.R. at 295; and *Vitelli, supra*, 93 B.R. at 894–97. The four-prong test is as follows:

> "such fees [must be] (1) allowable under the terms of § 506(b); (2) provided for in the parties' agreement; (3) reasonable; and (4) allowable under pertinent state law."

*Id.* at 894, quoting *Tashjian, supra*, 72 B.R. at 974. *Accord, Garnett, supra*, 99 B.R. at 295.

Observing the unlikeliness of the prospect that its claims are oversecured and hence allowable under § 506(b) and our disinclination to allow claims for compensation for post-petition services to creditors' counsel in any event, *see Garnett, supra*, 99 B.R. at 296–97, MBA has withdrawn its claims for post-petition services. All of the costs still requested were allegedly incurred pre-petition. In assessing such claims, we need only address the last three prongs of the *Tashjian* test. *See Vitelli, supra*, 93 B.R. at 899–900.

The fourth prong of the *Tashjian* test need not concern us, because there is no particularized state law relevant to the claims here, as there is in the case of such claims as to the residential mortgages in Pennsylvania in issue in *Garnett* and *Vitelli*. The most troublesome prong for MBA to satisfy with respect to costs is the requirement that same be provided for in the parties' Factoring Agreement.

■ We have carefully combed the Factoring Agreement in search of a clause which would authorize imposition of the costs which MBA seeks here upon PYP. Except for the statements therein that MBA must remit the "net amount" from its recoveries to PYP, which suggests certain deductions from a "gross amount," we cannot locate any provision in the Factoring Agreement which even suggests that MBA has the right to deduct expenses or costs from the sums remitted to PYP generally, nor any provisions allowing deduction of the specific costs claimed by MBA. In its lengthy Brief, MBA fails to cite to any specific provision of the Factoring Agreement to support these claims. The Factoring Agreement is a classic adhesion contract which must be construed, where in any sense ambiguous, against MBA, the party which has drafted it, *see Garnett, supra*, 99 B.R. at 296; *Vitelli, supra*, 93 B.R. at 896; *Nickleberry, supra*, 76 B.R. at 424–25; and *United Nesco, supra*, 68 B.R. at 974. As the Debtors point out, except for the following excerpt, buried within paragraph 14 of the Factoring Agreement, that Agreement contains no provision relating to any specific cost pass-throughs to the Debtors:

> Company agrees to reimburse Factor upon demand for all attorney's fees, court costs and other expenses incurred by Factor in enforcing any of Factor's rights against company under this agreement....

The absence of proof of a specific contractual provision justifying its right to reimbursement of costs requested is fatal to MBA's claim for same. *See Joshua Slocum, supra*, 103 B.R. at 607–08 (absence of leases which purportedly justify certain charges from the record is fatal to landlords' claim for such charges). We therefore believe that, except for costs and fees

incurred in enforcing MBA's rights under the Factoring Agreement, that Agreement can fairly be read as providing that all incidental costs are to be borne by MBA, compensation to which is rendered only in the form of commissions and discounted interest. Therefore, all of MBA's claims for costs (Items "c," "d," "e," "f," and "g") must be disallowed.[3]

■ The claims for pre-petition attorneys' fees appear to overcome the second-prong hurdle, due to the presence of the sentence in paragraph 14 of the Factoring Agreement quoted two paragraphs above. The greatest difficulty which MBA must overcome as to these claims is the hurdle of proving that these requests are "reasonable." Unless the court is in a position to assess the services of counsel provided in light of matters of record, no award or a very nominal award is all that is allowable for such services. *See Vitelli, supra,* 93 B.R. at 900–01 (docket entries of cases showing services performed was sufficient to justify an award of $500 out of a total of $1,188.20 requested); *In re Smith,* 76 B.R. 426, 432 (Bankr.E.D.Pa.1987) (testimony of mortgagee's attorney supported an award of $375 rather than the $500 sum requested); and *Nickleberry, supra,* 76 B.R. at 420–23 (testimony of experienced foreclosure counsel supported awards of $200 in uncontested foreclosure actions stayed by bankruptcy prior to judgment and $300 in uncontested foreclosure actions not stayed until after a sheriff's sale is scheduled rather than the $500 sum requested in all cases). Thus, we stated, in *Joshua Slocum, supra,* 103 B.R. at 608, as follows:

even if we had statutory or contractual authority to award the fees, we would still have to evaluate the reasonableness of the fees sought by the Landlords here. Some detail of the services performed, time expended, and hourly rates of counsel, akin to that required under the standards [of] *In re Meade Land & Development Co., Inc.,* 527 F.2d 280 (3d Cir. 1975), would be necessary to justify the Landlords' fee demands here, since the payments to the Landlords will be made from the proceeds of the debtor-estate. No detail is provided.... this claim must be rejected.

Except for the fees requested by Michael N. Gatto, Esquire, MBA's prior counsel in this proceeding, the sum and substance of the "detail" relating to claims for services submitted from the various attorneys engaged by MBA are as follows:

Item "i"—a bill for "consultation re Deeds" 2 hours at $125.00—$250.00.

Item "j"—a bill reciting "Total Due— $1,115.60" and a check to that counsel (Jonas) for $500.00.

Item "k"—a letter from counsel to Baron stating "[t]he total amount you were billed in legal fees plus costs in [*MBA v. Doran*] is approximately ... 4,100."

Item "l"—a bill with a firm letterhead stating "In re: Doran/[PYP]/[Orsa] Total—$2,500.00."

These statements are grossly inadequate to meet MBA's burden to show that such costs were "reasonable."[4] Except for the $500 to Jonas, for serving as escrow agent, which the Debtors agree is "proper,"[5] all

---

**3.** We also note that MBA's failed to support Items "c" or "g" with documentation. This deficiency would alternatively require rejection of these claims because of MBA's failure to meet the "reasonableness" prong of the *Tashjian* test as well. *See* page 426 *infra.*

**4.** For example, much of Beinstock's services were consumed with pursuit of the confessed judgment against the Dorans, which was of doubtful constitutionality and ethical propriety and the claim concerning which was ultimately withdrawn. Furthermore, in trying to bolster Beinstock's objectivity in the course of the prior proceedings, Marilyn expressly stated that Beinstock was *not* engaged as MBA's counsel in this

matter. *See* 99 B.R. at 612. If this claim were accurate, it is therefore difficult to understand his bill for services. The services provided by the other attorneys were never described in the lengthy course of these proceedings, and we have no idea what services they did perform, whether pre-petition, post-petition, or involved with matters other than those involving the Debtors here. Attorney Lickstein is not even identified on the bill accompanying Item "*l.*"

**5.** We would, however, again note that both Marilyn and Baron, in their testimony, attempted to distance themselves from Attorney Jonas in order to bolster his alleged objectivity as the escrow agent acting for both parties by contending that he was not previously known to them

of the requests will therefore be disallowed.

Attorney Gatto has presented us with a reasonably cogent itemization of his services. However, the entries for post-petition services subsequent to December 16, 1988, and those itemized only as "Telephone call Marilyn Tayler," and not further explained as to content, will be disallowed. Compensation for remaining 2.7 hours of services at the requested rate of $100 per hour will be allowed, resulting in an allowance of Gatto's services of $270.

The sum of items which we deem allowable can therefore be computed as follows:

| Item Letter | Item | Amount |
|---|---|---|
| "a" | Principal | $ 96,647.58 |
| "b" | Interest | 4,519.17 |
| "h" | Commission | 30,352.45 |
| "j" | Jonas' fee | 500.00 |
| "m" | Gatto's fee | 270.00 |
| | Subtotal | $132,289.20 |

**E. DEDUCTION OF ALLOWANCES TO THE DEBTORS ESTABLISHES THE AMOUNT OF MBA'S CLAIM AT $116,627.37.**

██ Both parties agree that certain allowances to the Debtors from the subtotal of charges allowable to MBA are appropriate. Firstly, MBA concedes that it collected $14,029.10 on PYP's accounts, which it has retained.[6]

Secondly, MBA admits that it collected and retained $2,525.00 in rents from the tenants in Orsa's property on Parker Street in Chester, Pennsylvania. The Code provides as follows regarding the liability of the transferee of an avoided transfer, at 11 U.S.C. § 550(d):

(d)(1) A good faith transferee from whom the trustee may recover under subsection (a) of this section has a lien on the property recovered to secure the lesser of—

(A) the cost, to such transferee, of any improvement made after the transfer, less the amount of any profit realized by or accruing to such transferee from such property; and

(B) any increase in the value of such property as a result of such improvement, of the property transferred.

(2) In this subsection, "improvement" includes—

(A) physical additions or changes to the property transferred:

(B) repairs to such property;

(C) payment of any tax on such property;

(D) payment of any debt secured by a lien on such property that is superior or equal to the rights of the trustee; and

(E) preservation of such property.

We find that MBA was a "good faith transferee," as it reasonably believed that its actions were justified, and we previously found that Doran was in large part responsible for his own financial difficulties. 99 B.R. at 622. *Compare Cole, supra,* 89 B.R. at 437. Marilyn testified that MBA expended the following sums on Orsa's properties:

| Expenditures | |
|---|---|
| Travel: | $ 847.50 |
| Utilities: | 892.27 |
| Legal: | 450.00 |
| Courier: | 52.00 |
| Telephone: | 250.00 |
| Total: | $2,491.77 |

Of these expenditures declared by Marilyn, we will allow only the "Utilities" of $892.27. We do not think that any of the other entries, none of which were supported with any documentation as were the rents received, qualify as "improvements" to the properties. The difference between this sum and the "profits" of $2,525.00, *see* § 550(d)(1)(A), is a negative $1,632.73. This sum must be added to the credits due to the Debtors to bring the total allowances to $15,661.83.

In displays of what can best be characterized as wishful thinking, the Debtors submit that we should also allow them the following credits: (1) $45,000 in rents due but uncollected from the Orsa properties; and (2) $250,000 for the value of PYP,

and had not actually represented MBA in this matter.

6. *But see* page 428 n. 7 *infra.*

which MBA has retained. The short answer to the claim for the first item is that § 550(d)(1)(A) only requires credit to be given to the transferor for actual "profit realized by ... such transferee," not the prospective profits which the transferee *could* have realized therefrom. There is no evidence that MBA did other than what we would normally expect it to so, *i.e.,* attempted to collect all of the rent that it could from the tenants of Orsa's property during its tenure as landlord.

Regarding the second item, we note that Marilyn testified that PYP has never published its directory and the possibility that it will do so has obviously become fainter as time as passed.[7] We held, in our previous Opinion, that, if the directory were not published, PYP had "virtually no value to Doran or anyone else." 99 B.R. at 613. Its name would appear to have only negative connotations to prospective future subscribers. Since the directory was not published, and there is no evidence of any prospect of its ever being published, we conclude that PYP has no value.

We shall therefore deduct only the $15,661.83 in credits from the $132,289.20 which we calculated to be the subtotal of amounts due to MBA from the Debtors. The end result is an allowable Proof of Claim against each of the Debtors, jointly and severally, of $116,627.37.

### F. MBA IS ENTITLED TO A SECURED CLAIM OF $85,000 AGAINST THE DORANS; ALL OTHER ASPECTS OF ITS CLAIMS ARE UNSECURED.

The Debtors contend that we should proceed to conclude, on the basis of the findings made in our previous Opinion, that MBA's claim against Orsa is unsecured and that its claim against the Dorans should be set at a maximum of $59,200 to $69,200 because the Dorans "can exempt $15,800 of equity in the home and to that extent avoid the lien of MBA. 11 U.S.C. section [sic] 522(d)(1), (d)(5) and (f)." Meanwhile, MBA contends that we must stop at this point

because the Debtors have not properly introduced the issue of the extent of its secured claims by instituting an adversary proceeding invoking 11 U.S.C. §§ 506(a) and (d) herein.

MBA's position has a surface attraction. It contends, though in non-specific terms, that it "would be prejudiced" if we made a § 506 determination at this time because the Debtors have not properly pleaded same. However, we note that the text of the Objections of the Debtors to MBA's claims in issue did specifically attack the secured status of MBA's claims in several regards (see paragraphs 11 and 12). Also, the parties have had an exhaustive trial, supplemented by the hearing on October 4, 1989, to present any evidence pertinent to every aspect of the relationship between them before us. In our previous Opinion, we made findings that Orsa had no equity in its properties and that the equity of the Dorans in their home was between $75,000 and $85,000. 99 B.R. at 613. Given the apparent inability of the parties to resolve any matters between them amicably, even an Opinion chocked with hints regarding the likely outcome of a § 506 proceeding could result in another(!) litigation sequel to this contested matter and the former proceedings, which would be costly to the parties and the scarce time resources of this court. We are therefore prepared to resolve the issue of the portion of MBA's claim which can be deemed secured here and now.

With respect to Orsa's properties, we have no doubt that Orsa lacks any equity in same. In fact, Marilyn opined, in her testimony in the previous trial, that the largest of Orsa's properties, the Parker Street, Chester, apartment building, was worth far *less* than the mortgage against it. 99 B.R. at 613. Therefore, MBA's claim against Orsa is clearly totally unsecured.

■ The Dorans' suggestion that their personal exemptions should be deducted

---

7. It is disturbing to the court to note that neither party appears to feel any responsibility to refund the sums collected by MBA to PYP's unfortunate prospective customers, all of whom advanced sums for advertising in what proved to be a non-existent yellow-page directory. Such practices can only serve to blacken the public conception of the "yellow-page industry."

from the value of their home in the process of valuing MBA's secured claim is not well taken. Since MBA's liens are not judicial liens, but are, rather, "security interests" in the nature of a mortgages, *see* pages 422–423 *supra,* they are not subject to avoidance pursuant to 11 U.S.C. § 522(f)(1). *See, e.g., Aikens, supra,* 87 B.R. at 353. A debtor's personal exemption is not deductible from the value of the interest of the debtor's estate in secured property in a § 506 calculation. *See In re 222 Liberty Associates, Wolk v. Goldome Realty Credit Corp.,* 105 B.R. 798, 804 n. 3 (Bankr.E.D. Pa.1989); and *In re Mays,* 85 B.R. 955, 961 (Bankr.E.D.Pa.1988), *aff'd,* C.A. No. 88–4306, 1988 WL 81716 (E.D.Pa. August 1, 1988).

In valuing the Dorans' equity in their home as of the crucial date of confirmation, *see, e.g., 222 Liberty, supra,* 105 B.R. at 801; and *In re Blakey,* 76 B.R. 465, 468–69, *modified on other grounds,* 78 B.R. 435 (Bankr.E.D.Pa.1987), which we will make certain transpires in the near future if at all, we are inclined, given the impact of inflation, to utilize the high figure at which Doran valued his home in testimony elicited eight months ago. Hence, we value the Dorans' equity in their home at $85,000. MBA's claim against the Dorans may therefore be bifurcated into a secured claim of $85,000 and an unsecured claim of $31,627.37.

## G. CONCLUSION.

We will enter an Order consistent with our conclusion that MBA has, jointly and severally, a valid unsecured claim of $116,-627.37 against Orsa and a valid claim against the Dorans $85,000 of which is secured and $31,627.37 of which is unsecured.